REPUBLICAN PUB. CO. V. MINER.

1. LIBEL AND SLANDER — CHARGE OF ATTEMPT TO MURDER — EVIDENCE — PECUNIARY LOSS.— Evidence of pecuniary loss is unnecessary to a right of action for a libelous charge of attempt to commit murder.

2. SAME — MITIGATING CIRCUMSTANCES — MALICE. — The accusation being an attempt to murder a family by poison, the answer alleging publication in good faith for a lawful purpose, without averring its truth, evidence that the persons mentioned in the alleged libelous article were poisoned; that a representative of defendant called on plaintiff after the publication of the accusation, and she refused to see him; and that the charges in the article were currently reported in the neighborhood at and before its publication,— is not admissible under Code of Civil Procedure, section 73, which provides that the truth of the alleged defamatory matter, and any mitigating circumstances to reduce the amount of the damages, may be alleged in defense to an action for libel, as such facts do not tend to reduce the damage, and, no punitive damages being allowed in Colorado, circumstances tending to establish or rebut the inference of malice are immaterial.

3. SAME — OPINION EVIDENCE.— The understanding of a witness that the publication in question charged an attempt to commit murder by poisoning is irrelevant, and its admission reversible error.

4. SAME — TRUTH OF CHARGE — PLEA OF JUSTIFICATION.— An instruction that, if the jury believed the matter published to be true, plaintiff could not recover, should not be given when defendant has neither pleaded nor attempted to prove justification.

*Appeal from District Court of Arapahoe County.*

THIS action was brought by the appellee, Eliza J. Miner, against the appellant, the Republican Publishing Company, for libel. The matter constituting the alleged libel was as follows:

"A FIENDISH ACT — AN ATTEMPT AT MURDER BY THE POISONING OF THE FAMILY OF J. T. POTTER — EIGHT PERSONS, AFTER PARTAKING OF A MEAL, ARE STRICKEN DOWN BY SICKNESS, WHICH PROVES TO HAVE BEEN CAUSED BY ARSENIC, ADMINISTERED IN FOOD — THE HIDDEN MYSTERY CONNECTED WITH THE AFFAIR — CONDITION OF THE PATIENTS.

"One of the most desperate attempts at murder the criminal annals of Arapahoe county record was made yesterday morning on the family of James T. Potter, an old citizen of Denver, residing at No. 865, Lawrence street, by means of arsenical poisoning. The facts in the case betray a most deplorable condition of affairs, and indicate, if their establishment can be judicially reached, the presence of a dangerous member of the community, whose apprehension and confinement should be at once directed by the authorities. At an early hour on Monday morning, the would-be victim of crime, with his family, consisting of a wife and children, a married daughter with her children, and servant girl, breakfasted, after which Mr. Potter, who is in the employ of the Denver & South Park road, proceeded to his business. Nothing occurred to disturb the harmony of the household until about 9 o'clock. About that hour Dollie Wilson, employed in the family, complained of feeling

unwell, and at the suggestion of Mrs. Potter abandoned her household duties, and retired. Nothing of a very serious character was apprehended, and it was thought her illness would soon be succeeded by convalescence. Half an hour later one of the children of the family was sent to Miss Wilson's room to ascertain her condition, and if there was anything she required. Upon opening the door of her apartment, the youthful messenger was startled at the spectacle which greeted her gaze. The occupant was discovered prone upon the bed, her eyes gazing into vacancy, her form transfixed, great drops of perspiration exuding from her brow, and the unfortunate woman apparently in the final pangs of dissolution. The alarm was at once given, and such remedies administered as the limited resources of the house in that behalf afforded. While means for her revival were being employed, Mrs. Bradford, a daughter of Mr. Potter, on a visit to her parents, was seized with pains in the back, followed by profuse vomiting, and other symptoms of poison, and was compelled to retire to her room, where she became so violently ill that for the time being her life was despaired of. Soon after, her two children were similarly affected, and, while they were being cared for by Mrs. Potter, that lady, with her four children, were compelled to yield, and took to their beds.

"In the meantime Mr. Potter had departed the city for Dome Rock, a station on the Denver & South Park road, on official business. He reached his destination almost at the hour his family was attacked; and, while employed in pursuit of the object of his mission, was suddenly attacked with pains of the most violent character, investing his entire system, accompanied by vomiting and the attendant indications of poison. With the greatest effort he was able to reached the shelter of a tree. His symptoms increasing in violence, he determined to gain the station, and proceed home before he was incapacitated from travel. In this he was success-

ful.   He made out to reach the cars, which he boarded, and came to Denver, arriving in the city late in the after-noon.   *En route* hither his pains continued, but with the aid of friends he was supported until his destination was reached, when he was driven home, and found his family as above described; every room in the house being allotted to the occupation of an invalid, none of whom had thus far received medical attendance.   Upon his arrival Mrs. Potter, by a wonderful exercise of will, arose from her bed of sickness, and ministered to his necessities.   Late in the day, neighbors, who had been attracted by the strange occurrences of the day, called to ascertain the cause, and, learning the condition of affairs, improvised means at once for their comfort and recovery. Mr. Hurd, a son-in-law of the afflicted family, came soon after, and, uniting his exertions with those of others, soon had the invalids in a condition of comparative quiet, though the symptoms manifested still continued, and refused to yield to such medicaments as had been administered.   At 1 o'clock yesterday morning Dr. McBeth, the family physician, reached the afflicted family, and after a careful diagnosis decided the entire household was suffering from the effects of arsenical poisoning. He began a treatment at once to counteract its effects, and was greeted with but limited results at first, but, assisted by those who had been summoned in view of the entire absence of nurses, he persevered, and by daylight had so far succeeded in his efforts that the patients, with the exception of Miss Wilson, were pronounced in a fair way of recovery.

"The cause of this mysterious attempt at the murder of a prominent and influential family, as stated, was arsenic, and an investigation of the means by which it could have been introduced into the household was begun.   The house is supplied with water by the Holly system, and an examination of the hydrant disclosed the presence of what remained of a coating of white powder,

lining the escape-pipe for several inches from its mouth. Last evening a reporter of the Republican called at the residence of the family, and witnessed a most pitiful spectacle. Mr. Potter was found in his bed, still suffering great pains, but hopeful that he would survive the attack; Mrs. Bradford, though up and about, was moaning with pain, and apparently enduring great suffering; her children, with those of Mr. Potter's household, were entirely convalescent, while Miss Wilson was still confined to her bed, with chances of recovery probable, rather than certain. Taken all in all, the situation, while more encouraging than could have been expected, was the reverse of cheerful.

"In search for the author of this deplorable state of affairs, the reporter had his attention directed to a woman residing in the neighborhood, who is known under the historic pseudonym of 'Lucretia Borgia,' though more familiar to her neighbors and officers of the law as Liza Miner. She is said to have attempted her own life on one or more occasions, failing in which she has supplied the craving for death by scattering what is supposed to have been poison about the neighborhood, to the death of dogs, chickens and household pets. The Borgia of the fourteenth century is represented as having been beautiful as the phantom of a dream, tall and commanding, with a form of matchless symmetry. The modern Borgia is diametrically the reverse in nearly every instance.

"With regard to the alleged type of that character suspicioned in this case, the reporter is unable to define her excellencies or deficiencies, for last night she was invisible. The neighbors speak of her as one who has been guilty of eccentricities that can be accounted for on no other hypothesis than insanity. A Mrs. Stearnes insists that she poisoned her cow in the spring of 1881, and that upon repeated occasions she has witnessed her scattering substance on potato parings, vegetables, etc., which upon examination she found to be ground glass. On yester-

day morning Mrs. Stearnes found a couple of ham bones tied up in a paper, upon which had been sprinkled a white powder, with the nature of which she was ignorant.

"A prominent citizen residing in the neighborhood mentions a circumstance which came under his observation several years ago. Captain Henderson and lady, employed in Snider & Strong's book-store, rented rooms of the Miner woman, who warned them to vacate, and they refusing, she prepared a composition of brimstone, etc., which she fired in the hall while Mrs. Henderson was asleep. The latter awakened during the smudging of the combustible and narrowly escaped with her life. The woman subsequently stated to Mrs. Nichols, residing in the vicinity, that it was her intention to obtain possession of the rooms, even if she had to do so at the sacrifice of life. It may be anything or nothing,— her alleged complicity,— but the one thing certain about it all is that Mr. Potter's family have been poisoned. And it seems to be the duty of the officers to seek out and punish the guilty party or parties."

It was published by the appellant in its newspaper, the Daily Republican, published at Denver, in the issue of June 21, 1882.

The answer to the complaint thereon consisted of specific denials and the following:

"And for a second and further defense, the defendant says that on or about the 20th day of June, A. D. 1882, one J. T. Potter, with his family, was a resident of the city of Denver; that on the morning of said day the said J. T. Potter, together with his said family, consisting of his wife and children and a married daughter with her children and a servant girl, breakfasted. Thereafter, and about 9 o'clock on the same morning, the servant girl was taken suddenly ill, and, at the suggestion of Mrs. Potter, retired to her room. Shortly afterwards she was discovered apparently in a convulsion by other members of the family. While remedies were being ad-

ministered for her revival, the said married daughter of Mr. Potter was suddenly seized with severe pains in the back, followed by profuse vomiting, and other symptoms of poisoning. At about the same time her two children were similarly attacked, and, while being cared for by Mrs. Potter, she (Mrs. Potter) and her four children were also attacked with like symptoms, and compelled to go to bed. And Mr. Potter was also at about the same time attacked in a similar manner. Upon summoning a physician, he, upon examination, decided that the entire family were suffering from the effects of arsenical poisoning. He began a treatment to counteract the effects of such poison, and after about twenty-four hours succeeded in placing the patients in a fair way of recovery. An investigation disclosed the presence of a white powder in and about the pipes through which the house was supplied with water. Upon the evening of the said 20th of June, an employee of the said defendant visited the family of Mr. Potter. Mr. Potter was found in his bed, still suffering great pains, but hopeful that he would survive. The married daughter, though up and about, was moaning with pain, and apparently enduring great suffering. Her children, with those of Mr. Potter's household, were convalescing, except the servant girl, who was still confined to her bed, with chances of recovery probable, rather than certain. In a search for the author of this deplorable state of affairs, the said employee of the defendant had his attention directed to the plaintiff by some persons unknown to said defendant, and who was reported to said employee as having scattered what was supposed to be poison about the neighborhood, to the death of dogs, chickens and household pets, and that said plaintiff exhibited certain eccentricities that, as alleged, could be accounted for upon no other hypothesis than insanity. That said employee was informed by the neighbors aforesaid that the said plaintiff had, in the spring of 1881, poisoned a cow of one

Mrs. Stearnes, then living in the vicinity of said plaintiff; and that said neighbors had witnessed said plaintiff scattering some substance on potato parings and vegetables, which, upon examination, proved to be ground glass; and that on the said 20th day of June the said Mrs. Stearnes had found tied up a couple of ham bones, upon which had been sprinkled a white powder, with the nature of which the said Mrs. Stearnes was unacquainted, but supposed to be poison. That said employee was also informed by one of the neighbors of said plaintiff, who is unknown to defendant, that upon a certain occasion, several years before the said 20th of June, the said plaintiff had attempted to drive from the house of said plaintiff certain tenants of said plaintiff, by preparing and setting fire to a composition of brimstone and other hurtful and deleterious matter, she (the said plaintiff) upon that occasion stating that she (the said plaintiff) would obtain possession of said premises if she were obliged to do it at the sacrifice of life. By reason of which said reports, so made as aforesaid, the said defendant then and there, believing all the matters aforesaid to be true, and being moved solely by a conscientious desire to discharge the duty owing from said defendant to the public, and in good faith to encourage and inspire the officers of the law to investigate all said matters and bring to justice the guilty parties, if any there were, the said defendant published the said supposed libel, as it lawfully might, then and there, and by the same article, disavowing any belief or opinion as to the complicity of said plaintiff in any of said matter, and not that the said defendant maliciously and falsely charged said plaintiff in the said supposed libelous publication with having poisoned the Potter family, and attempted to commit the crime of murder, as in said complaint of said plaintiff is alleged."

By the replication the allegations of the answer were denied. Upon the trial, upon the part of the appellee, the said article was admitted in evidence; also another

article, published in said daily paper two days after the publication of the first, which article was as follows:

"MRS. MINER UNJUSTLY ACCUSED.— At the time of the poisoning in the Potter family, on upper Larimer street, it was generally circulated that a Mrs. Liza Miner, a neighbor of the Potters, was implicated in the administering of the poison. It now transpires that the sickness of the Potter family was caused by eating a poor article of ice-cream, and of course Mrs. Miner is exonerated from all connection with what at first was supposed to be an attempt at murder. Mrs. Miner felt very badly about the reports circulated, and the parties who were so assiduous in connecting her name with the affair owe the lady the most abject apology. It seems that Mrs. Miner has had difficulty with some of her neighbors, and they embraced the Potter poisoning case as an opportunity to vilify the name of their enemy. On the night of the poisoning, a half dozen neighbors told a Republican reporter who called, that they were positive of Mrs. Miner's guilt. The lady comes from one of the best families, and her friends are extremely glad to have the outcome as it is."

Verdict was given for the appellee for $3,000, and judgment was given thereon, to reverse which this appeal was taken.

The errors assigned go to the admission of certain evidence and the rejection of certain other evidence, to the giving of certain instructions, and to the refusal to give certain other instructions.

Mr. L. B. FRANCE, for appellant.

Mr. JOHN H. CROXTON, for appellee.

STALLCUP, C. 1. Against the objection of appellant, the court permitted witnesses for appellee to testify as to their understanding of what was charged by the said matter so published June 21st; their testimony being that

they understood that the offense of attempt to murder by poisoning was charged thereby. I think this evidence was improperly admitted, and that the evidence so admitted was prejudicial to appellant. By section 10, article 2, of our constitution it is provided that in cases of this kind, under the direction of the court, the jury shall determine the law and the fact.

The admission of improper evidence, calculated, as this was, to influence the jury in such determination, cannot be said to be without prejudice, especially in view of the directions upon which the question was submitted to the jury, wherein the court, correctly, as I think, directed the jury to find from the evidence and the publication whether or not the publication charged an attempt to commit murder by poisoning the family of Potter.

There was no pretense that the witnesses who gave the said testimony were possessed of superior knowledge in the premises, or that the question was one calling for or admitting of expert testimony. The evidence had no legitimate place in the case, and was calculated to mislead the jury. See *Railroad Co. v. Wilson, ante*, p. 20.

2. For libel charging the crime of murder, or attempt to murder, a recovery may be had without proof of an actual pecuniary loss. This is so because the natural or necessary consequence thereof is to cause injury to the person so defamed — in his feelings, in his reputation, in his pecuniary affairs, or in all of them. It seems to be accepted without showing that injury follows to the person who is so wrongfully assaulted in his reputation and character; and this seems in accord with reason, as it is certainly reasonable and right that every person should desire the esteem of the people of the community in which he lives, and that the same should be held of value. There was no error, therefore, in the court's instruction on this branch of the case.

3. The appellant upon the defense was permitted by the court to give testimony showing the general reputa-

tion of the appellee in the neighborhood for "peaceable-ness, quietness and as a neighbor" before and at the time of said publication. And in rebuttal the appellee was permitted to give testimony as to her general reputation in the neighborhood as to good moral character and worth.

The appellant upon the defense also offered to prove, among other things: *First*, by the attending physician of the said Potter family that the said family were suffering from the effects of arsenical poison upon the occasion referred to; *second*, by the manager of the Republican Publishing Company that he called to see the appellee after the publication of the said article, and that she refused to see him (there being nothing to disclose the purpose for which he wished to see her); *third*, by witness George Bennett, a neighbor of the appellee, that the matters contained in the publication were currently reported in the neighborhood at and before the same were published,— all of which were rejected by the court. By section 73 of our code it is provided as follows: "In the actions mentioned in the last section [libel and slander] the defendant may, in his answer, allege both the truth of the matter charged as defamatory and any mitigating circumstances, to reduce the amount of damages; and, whether he prove the justification or not, he may give in evidence the mitigating circumstances." Other states have a like legislative provision concerning the rights of defendants in actions for damages for libel and slander, and the scope thereof has been considered by the courts of those states. See *Bush v. Prosser*, 11 N. Y. 347; *Bisbey v. Shaw*, 12 N. Y. 67; *Wilson v. Fitch*, 41 Cal. 363.

The damages recoverable in this action under the decisions of this court are confined to compensatory as distinct from punitive damages; that is to say, nothing is recoverable as penalty for malice in an action of this kind. This was conceded by the parties in this case and

the jury was so instructed by the court.    See *Murphy v. Hobbs*, 7 Colo. 541; *Railroad Co. v. Yeager*, 11 Colo. 345.

According to the law applicable in this case the mitigating circumstances referred to in said section 73 are limited to circumstances tending to show a mitigation of the injury inflicted — a mitigation of the damages naturally flowing therefrom.  The circumstances showing the acts and conduct of the party inflicting such injury in retracting or explaining the matter published, or anything else tending to lessen or to remove the injury or in any way to restore the injured party to the esteem previously enjoyed, are admissible in mitigation.    Likewise evidence tending to show the character of plaintiff and his general reputation should, I think, be admissible in this state; and this is especially true where, as in the case at bar, no special damages are alleged or proven. Circumstances which in no way mitigate the injury or show the extent of the injury inflicted cannot mitigate the damages or lessen the amount of compensation deemed commensurate with the injury.   Where punitive damages are eliminated entirely from the case, as in this state, circumstances relating to malice seem to have no purpose or place in the case. It will be seen that in many of the other states the recovery in such cases is not so limited, but may extend to punitive damages.    For this reason the rule as stated in those states is inapplicable here.    See *Wilson v. Fitch,* 41 Cal. 363; *Bisbey v. Shaw,* 12 N. Y. 74.    It does not appear that the evidence above stated could in any way mitigate the compensatory damages recoverable in this action.    The rejection thereof, therefore, was not error.

4. The appellant requested the court to instruct that, if the jury believed that the matter published was true, there could be no recovery.   There was no error in refusing such instruction, as the appellant did not justify,

by pleading, the truth of the matter published.   Cooley, Torts, 207, 208.   Neither was there any attempt to prove the truth thereof.

For the errors noticed the judgment should be reversed and the case remanded.

PER CURIAM.   For the reasons given in the foregoing opinion of Commissioner STALLCUP, the judgment of the court below is reversed and the cause remanded.   .

*Reversed.*