## REPUBLICAN PUB. CO. v. MOSMAN.

1. PLEADING — LITERAL DENIALS.— A statement in an answer that defendant did not wickedly, etc., intending to injure, etc., publish the supposed defamatory matter, is not a denial of the publication, but merely a denial of malicious intent in publishing; and proof of publication is unnecessary under such denials.

2. WRITTEN DEFAMATION MORE INJURIOUS THAN ORAL.— Written defamation is more injurious than oral; and injury will be presumed from certain defamatory words when printed and published, even though the same words may not be actionable *per se* if merely spoken.

3. WHEN WRITTEN LANGUAGE LIBELOUS PER SE.— "Any false and malicious writing published of another is libelous *per se* when its tendency is to render him contemptible or ridiculous in public estimation, or expose him to public hatred or contempt, or hinder virtuous men from associating with him."

4. SAME — WITHOUT PROOF OF SPECIAL DAMAGES.— A newspaper article falsely charging a man with abusing his wife by taking away her young babe and declaring that she shall never see it again, with not providing sufficient fuel to keep her warm, with telling her he has fixed her friends so that they will have nothing more to do with her, with attempting to make it appear that his wife is insane so that her complaints against him shall not be noticed, is libelous *per se*, and an action for *general compensatory damages* may be maintained thereon without allegation or proof of *special* damages.

5. SAME — TRUTH AND MITIGATING CIRCUMSTANCES.— In actions for libel or slander the defendant may show the truth of the published matter as a complete justification and defense, and may give in evidence any circumstances properly in mitigation of the publication for the purpose of reducing the damages, even if the publication be in fact false.

6. EXEMPLARY DAMAGES — MALICE.— In jurisdictions where exemplary damages are allowable the malice of the defendant in publishing the libel is proper to be considered as an aggravation of the damages; and in such case the defendant is entitled to show the absence of malice in order to be relieved from such exemplary damages; but as the law in this state did not allow exemplary damages in actions for libel when this action arose and was tried, it was not error to exclude evidence tending to show absence of malice on the part of defendant.

7. MENTAL SUFFERING AN ELEMENT OF DAMAGE.— The mental suffering of the plaintiff occasioned by the publication of written slander libelous *per se* may be taken into consideration in awarding general compensatory damages, that is, such damages as are commensurate

with the loss or injury sustained by him in consequence of the publication.

8. COMMON REPORT IN MITIGATION.— In an action for written defamation the defendant is entitled to give in evidence that the defamatory matters complained of were current and common report at and before the publication thereof, and that they were published by defendant in good faith relying upon such reports; and such matters should be submitted to the consideration of the jury as mitigating circumstances, even if the matters so published were in fact false.

9. RUMOR AND REPETITION NO DEFENSE.— Where the defamatory publication complained of contains only an account of current reports or rumors in order to a complete justification and defense, the publisher must not only prove it to be true that there were such rumors, but must also prove that such rumors were true; the publication of libelous matter cannot be justified on the ground that it is a mere repetition and republished as such.

*Appeal from District Court of Larimer County. On rehearing.*

THE facts necessary to an understanding of the opinion are as follows: In December, 1885, appellee, Frank J. Mosman, plaintiff below, was engaged in mercantile business, in the city of Ft. Collins, Larimer county, Colo., and appellant, the Republican Publishing Company, defendant below, was a corporation, and the owner, proprietor and publisher of a certain newspaper having a circulation in said city of Ft. Collins. On December 29, 1885, the defendant published in its said newspaper the following article of and concerning the plaintiff:

" Inhuman, if true.

" A case of cruelty which should be carefully investigated. Special to the Tribune-Republican.

"Fort Collins, Colorado, December 28. Last fall, F. J. Mosman and family, consisting of a wife and one child, came to Fort Collins from some place near Buffalo, New York. Mr. Mosman was troubled with weak lungs, and by the advice of relatives he selected Colorado as the place where his disease would in a measure be cured. His wife, a beautiful young woman but twenty years old, cheerfully left the home of her childhood and relatives, and came with

him, because she was told that his lung trouble would be relieved by the change. Shortly after their arrival a second child was born, and all was supposed to be cheerful in the household by those with whom an acquaintance had been formed, until within a few days past, since which time it has developed that the husband is in the habit of abusing his young wife. Mosman, shortly after coming here, bought out a shoe dealer on Linden street, and has since conducted the business, receiving a fair share of the trade.

"The first that was known of the mistreatment of his wife was a few days since. She called on a near neighbor and endeavored to sell a portion of the furniture out of her house, saying that 'Fred [her husband] failed to keep enough fuel at home to keep her warm.' The neighbor declined to buy, as she had no room for more furniture, and asked her how the babe was getting along. The inquiry brought the tears to the eyes of the young wife, who said, 'Jud took the babe away three days since, and has not returned it yet. He took it down to his mother's, and when he went away he said he would never come back again, nor ever let me see the babe again.' She was completely overcome with grief, and nearly crazy at the condition in which she was placed; and all this time her husband was at his store in a happy frame of mind over the game which he was playing on his poor, defenseless wife at home, who dared not leave the house, as he thought, she being a stranger in the locality in which she lived.

"As soon as the husband found that some of the neighbors had become interested in his wife's condition, he made overtures towards a reconciliation, which was effected, the poor wife being nearly frantic over the loss of her child, and willing to make any concessions in order to have it with her again. But the reconciliation was only a sham, for he immediately called upon those to whom his wife had told her pitiful tale, and made all efforts to impress upon their minds that his wife is crazy, and her ravings are not to be noticed.

"But his efforts in that direction were not crowned with success, and he received but little sympathy and considerable condemnation from all to whom he appealed. Nothing daunted, and with a zeal worthy of a better cause, he returned to his home, telling his wife, 'I have just been to call upon your friends, and have fixed them so that they will have nothing more to do with you,' after which he employed a prominent physician to visit his wife and examine her with a view of having her incarcerated in an insane asylum, as being of unsound mind, and unfit to have charge of her children. The physician made the visit, and declares that the poor woman's mind is in an unsettled condition, and that he doubts not that incarceration in an insane asylum would be a great relief and a benefit to her."

The plaintiff brought suit against defendants for publishing said article, alleging damages generally in the sum of $10,000. The cause was tried by a jury, who returned a verdict in favor of the plaintiff for the sum of $775. Motions for a new trial and in arrest of judgment were overruled, and judgment was entered on the verdict in favor of the plaintiff. Defendant brings this appeal.

Mr. L. B. FRANCE, for appellant.

Messrs. CLARK & DAVIDSON, ROBINSON & LOVE and E. A. BALLARD, for appellee.

MR. JUSTICE ELLIOTT delivered the opinion of the court.

The publication by defendant of the article complained of at the time and place alleged in the complaint not being denied, proof of such publication was, by a familiar rule of practice, unnecessary at the trial. The statement in the answer that *defendant did not wickedly, etc.*, intending to injure, etc., publish the *supposed defamatory libel*, is not a denial of the publication, but merely a denial of malicious intent in publishing. The answer, however, not only denies that defendant was actuated by malice in publishing, but

denies that the article was either scandalous or libelous. The answer also alleges that the matters published of and concerning the plaintiff were of current and common report before the publication thereof by defendant, and that said matters were and are true.

The reply denies that such reports and rumors were current, etc., and denies that the same, or any of them, are or ever were true.

The assignments of error cover a wide range, and raise important questions upon the law of defamation. The argument of counsel in support thereof is original and comprehensive, and, in some instances, most radical views are expressed. That some changes have been made in the law relating to libel and slander by modern legislation, notably in matters of pleading and practice, is well understood, and that much light has been gained from modern decisions and authors evincing growth in this as in other branches of our jurisprudence, will be readily conceded. But on this appeal, as in other cases, it is the province of this court simply to ascertain and announce the law as we find it, so far only as the same is applicable to the questions properly presented by the record.

At the outset it is contended by counsel for appellant that the article complained of is not libelous *per se*, and not actionable, unless its publication has occasioned special damages to plaintiff, and that such special damages must be alleged and proved to warrant a recovery; that, inasmuch as special damages are not alleged, the complaint does not state facts sufficient to constitute a cause of action; and that defendant is entitled to judgment thereon in its favor in any event. If the premises thus stated by counsel for appellant be granted, the logic of his argument would seem to be unanswerable, and the conclusions inevitable. To render a publication libelous *per se*, appellant's counsel in his brief claims the common-law rule to be: " The words must contain an express imputation of some crime liable to punishment,—some capital offense or other infamous crime

or misdemeanor." It is conceded that the Criminal Code
(R. S. 1868, ch. 22, § 121) gives a definition of *libel as a*
*crime or misdemeanor* different from the foregoing; but it
is insisted that, *for the purpose of a civil action,* defama-
tory words, either oral or written, to be libelous *per se,*
must fall within the limits of the common-law rule, as
above stated. As the rule thus contended for lies at the
foundation of appellant's first assignment of error, let us
test it by the authorities of the common law, and the light
of reason and experience.

The cases relied on by counsel for appellant to support
the view that defamatory words are not actionable *per se,*
unless they contain an express imputation of some crime
liable to punishment, are cases of mere oral slander, and
do not sustain the theory that oral and written defamation
are subject to the same rules in determining what words are
or are not actionable *per se.* The case of *Onslow v. Horne,* 3
Wils. 186, decided in 1771, in which Lord Chief Justice De
Grey laid down the rule above quoted from appellant's brief,
was an action for *words spoken,* and no allusion is made to a
case of written slander. The same is true of the case of
*Brooker v. Coffin,* 5 Johns. 188, a case much relied on by ap-
pellant. It is worthy of special note that in the case of
*Steele v. Southwick,* 9 Johns. 214, a case of libel, the same
court draw the distinction between oral and written slan-
der. It is true an occasional text-writer has given some
countenance to the theory of appellant, above stated, as
being reasonable and logical, but none have been bold
enough to declare the same to be the law. The following
quotations from standard authors show clearly what the
law is upon the subject.

Chancellor Kent, in his Commentaries (volume 2, p. 16),
speaks as follows: "As a part of the right of personal
security, the preservation of every person's good name from
the vile arts of detraction is justly included. The laws of
the ancient, no less than those of modern nations, made
private reputation one of the objects of their protection.

The Roman law took a just distinction between slander spoken and written; and the same distinction prevails in our law."

In Starkie on Slander and Libel (page 39) it is said: "The law * * * makes that to be actionable without special damage, when it was written or printed, which would not have been deemed actionable had it been merely spoken." And again: "Whatever tends to lower and degrade a man's moral character in society, or to expose him to contempt and ridicule, is criminal, if it be published in writing, although the very same matter, if spoken only, would have constituted no offense."

In Townshend on Slander and Libel (section 18) it is said: "To language in writing is attributed, in *most* cases, a greater capacity for injury than is attributed to language spoken, or speech, so that language which, if spoken, gives no right to redress, may, if reduced to writing, give a cause of action."

In Odgers on Libel and Slander, an English work published in 1881 (1st Amer. Ed. p. 3), we find the following: "The presumption that words are defamatory arises much more easily in cases of libel than in cases of slander. Many words which, if printed and published, would be presumed to have injured the plaintiff's reputation, will not be actionable *per se* if merely spoken. The reasons for this distinction are obvious: *Vox emissa volat,— litera scripta manet.* The written or printed matter is permanent, and no one can tell into whose hands it may come. Every one now can read. The circulation of a newspaper is enormous, especially if it be known to contain libelous matter. * * * Whereas a slander only reaches the immediate bystanders, who can observe the manner and note the tone of the speaker,— who have heard the antecedent conversation which may greatly qualify his assertion,— who probably are acquainted with the speaker, and know what value is to be attached to any charge made by him; the mischief is thus much less in extent, and the publicity less durable."

The author concludes with the observation that "*the distinction between oral and written slander has been recognized in numerous cases, and is far too well established to be ever shaken.*"

Mr. Justice Cooley, in his treatise on the Law of Torts (page 239), speaking of the difference between slander and libel, says: "There is, however, a difference in the substance of what shall constitute an actionable charge. It is perfectly reasonable to allow greater liberty of vocal speech than of writing or printing, for two very plain reasons:

"(1) Vocal utterance does not imply the same degree of deliberation; it is more likely to be the expression of momentary passion or excitement, and is not so open to the implication of settled malice. * * * Therefore, to such oral expressions, little importance is generally attached. On the other hand the same words deliberately written or printed, and afterwards placed before the public, usually justify an inference that they are the expression of settled conviction, and they affect the public mind accordingly.

"(2) An oral charge is merely heard, and the agency of the wrong-doer in inflicting injury is at an end when the utterance has died upon the ear. But the written or printed charge may pass from hand to hand indefinitely and for many years. It is an ever-continuous defamation so long as that by means of which it is communicated remains in existence.

"These reasons are taken notice of in the law, and some charges are held to be *prima facie* actionable as libel that are not actionable as oral slander unless there be averment and proof that actual injury has resulted. In other words, injury is presumed to follow the apparently deliberate act of putting the charge in writing or print, or of suggesting it by means of picture or effigy, where a mere vocal utterance to the same effect might be disregarded as probably harmless."

Let us see further what kind or class of *written publications* are regarded as libelous *per se* according to the rules

of the common law.  Again we quote from standard authors.

In Cooley on Torts (side p. 206) the rule is stated thus: "Any false and malicious writing published of another is libelous *per se* when its tendency is to render him contemptible or ridiculous in public estimation, or expose him to public hatred or contempt, or hinder virtuous men from associating with him."

In 2 Add. Torts, § 1089, it is said: "All publications in writing or in print, imputing to another disgraceful, or fraudulent, or dishonest conduct, or which are injurious to the private character or credit of another, or tend to render a man ridiculous or contemptible in the relations of private life, are libelous, and an action for damages is maintainable against the writer and publisher, unless the publication ranges within that class of communications which are termed 'privileged communications,' presently mentioned, or unless the libeler can prove the truth of the libel."

In a note to the foregoing section from Addison it is pertinently said: "The law recognizes the value of personal character, and throws around it all safeguards essential for its preservation or vindication, and whoever, by writing, signs, pictures, effigies, or other physical means, does that which tends to defame another by bringing him into comtempt, ridicule or disrepute, socially or morally, with his fellows, or which injures him in his office, trade, profession or business, does an unlawful and unwarrantable act, unless he can vindicate his act by showing that it did not *in fact* defame such person, because of its truth or fitness as applied to the individual affected thereby."

Kent and Townshend, Starkie and Odgers, and other eminent common-law writers, together with a multitude of judicial decisions, ancient and modern, substantially agree with the foregoing views.

In Bac. Abr. (volume 6, p. 337) "libel" is defined to be, "A malicious defamation, expressed either in printing or writing, or by signs, pictures, etc., tending either to blacken

the memory of one who is dead, or the reputation of one who is alive, and thereby exposing him to public hatred, contempt or ridicule."

"Libel" thus defined was, according to Bacon, actionable, at common law, either civilly or criminally. Considering how closely the foregoing definition has been followed by our law-makers, we are led to the conclusion that libel, as defined in the Criminal Code (section 121, *supra*), is substantially declaratory of the common law, and applicable to civil as well as criminal cases, except where the same has been modified by constitutional or legislative authority.

The publication in this case was in no sense privileged. The plaintiff was in private life. The article concerned his domestic affairs; and no duty devolved upon defendant to give publicity to plaintiff's supposed conduct through the medium of the public press. Hence, in doing so, defendant must be held to have acted at its peril; and the publication, if false, must be considered as libelous *per se*, or otherwise, according to the uniform rules of law, as above declared. A brief analysis of the article will reveal its character. The very first word characterizes the supposed conduct of plaintiff as " *inhuman;* " the next line denominates it a case of " *cruelty;* " then follows, in sensational style, an account of plaintiff's supposed conduct. He is charged with *abusing his young wife by taking away her young babe, and declaring that she shall never see it again; with not providing sufficient fuel to keep her warm; with telling her that he had fixed her friends so that they would have nothing more to do with her; also, with attempting to make it appear that his wife was insane, so that her complaints against him shall not be noticed.* In this enlightened age and country it is scarcely necessary to say that such charges printed and published are well calculated to bring the accused into contempt, to excite hatred against him, and to cause all good people to refrain from associating with him. Hence, if false, the article is libelous *per se.* It was not error to admit the same in evidence, and to

overrule the motion for a nonsuit without evidence of special damages.

The remaining assignments of error to be considered relate to the rulings of the court upon the evidence and instructions. Notwithstanding evidence of the printing and publishing by defendant was properly admitted on behalf of plaintiff, defendant was entitled to give evidence to show that the matter charged against plaintiff was true as published. If the truth of the published matter could be established by evidence, it was a complete justification and defense. The defendant was also entitled to give in evidence any circumstances properly in mitigation of said publication, for the purpose of reducing the amount of damages, even if the publication was, in fact, false. Const. art. 2, § 10; Code Civil Proc. § 69.

Evidence was offered for the purpose of showing that the agents of defendant were not actuated by malice in causing the publication complained of. The offer was objected to, and the evidence was refused. Such ruling is assigned for error. Much has been written, and much learning and logic displayed, in endeavoring to determine whether or not malice is an essential element of libel. In this case, however, we do not find it necessary to enter into any considerable discussion of the question, for reasons which may be briefly stated. In jurisdictions where exemplary damages are allowable, the malice of defendant in publishing the libel is proper to be considered as an aggravation of the damages — in other words, for the purpose of obtaining exemplary or punitive damages; and, in such case, the defendant is undoubtedly entitled to show the absence of actual malice in causing the publication in order to be relieved from such exemplary or punitive damages. But at the time this action arose, and when the same was tried, the law in this state did not allow exemplary damages in cases of this kind; and the trial court expressly instructed the jury that " compensatory damages only can be allowed." Hence, it was not error to exclude the evidence offered by defendant

to show absence of malice on its part. This has been expressly decided by this court, and it is unnecessary to restate the reasoning of those decisions. *Murphy v. Hobbs*, 7 Colo. 541; *Publishing Co. v. Miner*, 12 Colo. 77; Odgers, Sland. & Lib. 302. But see Session Laws 1889, p. 64.

The jury were instructed to the effect that if their finding should be in favor of the plaintiff, they should award such damages as he may have sustained in his feelings, reputation and character by reason of the publication; but that, for such purpose, plaintiff was not to be considered as a person of more than ordinary sensibilities. Whatever may be the rule as to the elements constituting *special* damages, in cases where the words are not actionable *per se*, and where special damages must be alleged and proved to warrant a recovery, we are satisfied that, in cases of written slander where the defamatory matter is libelous *per se*, the mental suffering of the plaintiff, occasioned by the false publication, may be taken into consideration in awarding *general* compensatory damages. Hence, the instruction as given cannot be considered erroneous. Odgers, Sland. & Lib. 318; 3 Suth. Dam. 643 *et seq.;* Field, Dam. § 691; *Murphy v. Hobbs, supra,* 548; *Wadsworth v. Treat,* 43 Me. 163.

The jury were charged in substance that, to justify the publication so as to relieve defendant from the payment of compensatory damages, the evidence introduced must prove the truth of every material part of the defamatory matter contained in the publication. Considering the state of the pleadings and proof at the time, this instruction was substantially correct; but when considered in connection with instructions prayed by defendant relating to evidence in mitigation of damages, we find it difficult to say that the cause was properly submitted to the jury. Compensatory damages, under the circumstances of the case, are such as are commensurate with the loss or injury sustained by plaintiff, in consequence of the publication complained of. Under the law as it stood at the time of the publication,

and at the time of the trial, as we have seen, neither actual malice nor any other aggravating circumstance would warrant the jury in awarding exemplary or punitive damages. On the other hand, if the publication was wholly false, then neither the absence of malice nor ignorant mistake on the part of the publisher would take away plaintiff's right to full compensatory damages.

But there is still another view of the case to be considered. The defendant alleged in its answer that the matters contained in the supposed defamatory publication were current and common report and rumor at and before the publication thereof by defendant, as aforesaid; and that such matters were so published by defendant in good faith relying upon such rumor. Plaintiff joined issue on these allegations; and evidence pertaining thereto was admitted at the trial. Under such circumstances defendant was entitled to have such evidence as *mitigating circumstances* properly submitted to the jury, for the purpose of reducing the amount of the damages, even if it failed in its plea of justification, and even if the publication were, in fact, false. Compensatory damages, under the circumstances, were only such as were occasioned by the false defamatory matter contained in the publication, less whatever of damage, if any, had already been occasioned to plaintiff by common current report of the same false, defamatory matter circulated without the agency of defendant before the publication thereof by the defendant. In other words, to determine how much plaintiff's reputation had been injured by the publication of the defamatory matters by defendant, it was proper to ascertain the *status* of his character or reputation, *in relation to such matters*, prior to such publication.

The evidence tended to show that the defamatory matters, as published, or portions thereof, had been more or less circulated in the community where plaintiff lived before the same were published by defendant. Hence, the publication of them in defendant's newspaper, though perhaps

greatly augmenting the injury to plaintiff's good name, might not have been so prejudicial to him as if the same had never been thus previously circulated to his discredit. This view of the case, in substance, the defendant asked to have submitted to the jury. The refusal of the court to give an appropriate charge or instruction upon this point may have been prejudicial to the substantial rights of the defendant, and was, therefore, error. Odgers, Sland. & Lib. 305, and notes; *Wetherbee v. Marsh*, 20 N. H. 561; *Case v. Marks*, 20 Conn. 248; *Bridgman v. Hopkins*, 34 Vt. 532; *Willover v. Hill*, 72 N. Y. 36; *Proctor v. Houghtaling*, 37 Mich. 41; *Hatfield v. Lasher*, 17 Hun, 23.

We must not be understood as indicating that mere rumor, mere disparaging remarks, or discommendatory statements, sometimes called "gossip," should be considered as mitigating circumstances of any very great weight as against the deliberate publication of such matters in the public press. "For," in the language of Mr. Starkie, "if the report may be spread over the world, by means of the press, the malignant falsehoods of the vilest of mankind, which would not receive the least credit where the author is known, would make an impression which it would require much time and trouble to erase, and which it might be difficult, if not impossible, ever completely to remove. He who prints and publishes what was given to him in manuscript has to answer for by far the greatest part of the mischief that the statement has occasioned."

We are aware that this question has been fruitful of much legal controversy and of considerable conflict in judicial opinions; but the tendency of modern decisions, as well as modern legislation, is in the direction of giving larger scope to the introduction of mitigating circumstances in favor of defendants in actions for libel or slander. Giving our statute (Code, § 69, *supra*) a liberal construction, and especially considering how the pleadings in this action are framed, we are of the opinion that common reports and rumors, to the same effect as the defamatory publication

complained of, if circulated before such publication and without the agency of the defendant, were proper to be admitted in evidence, and should have been submitted to the jury by an appropriate and well-guarded instruction, not in any sense as a justification of the publication, but as matter tending in some degree, perhaps, to show that the plaintiff had suffered less damages than he might otherwise have sustained by reason of the publication. It must be observed that, even where the publication purports to contain only an account of current reports or rumors, in order to a complete justification and defense, the publisher must not only prove it to be true that there were such rumors, but must also prove that such rumors were true. The publication of libelous matter cannot be justified on the ground that it is a mere repetition and republished as such. Starkie, Sland. & Lib. § 322; Odgers, Sland. & Lib. 305; Townsh. Sland. & Lib. § 112 *et seq.*, also 210, and notes; Moak, Underh. Torts, pp. 143–145.

The former opinion in this case is withdrawn; but the former decision of this court, reversing the judgment of the district court and remanding the cause for a new trial, is adhered to for the reasons stated in this opinion.

*Reversed.*