Thomson, J.,
delivered the opinion of the court.
This is an action for libel, brought by Eliza J. Miner against The Republican Publishing Company. The only question to be determined relates to the sufficiency of the complaint. The defendant moved in arrest of judgment for the reason that the complaint did not state facts sufficient to constitute a cause of action, because the alleged libelous words set forth are not actionable per se. The motion was denied and judgment entered on the verdict. This action of the court is the subject of the only errors assigned.
The following is a copy of the alleged libelous publication, as set forth in the complaint, together with the innuendoes of the pleader:—
“A FIENDISH ACT.
“An Attempt at Murdeb by the Poisoning oe the Family oe J. T. Potteb.
“ Might persons, after partaking of a meal, are stricken down bv sickness, which proves to have been caused by arsenic administered in food. — The hidden mystery connected with the affair.— Condition of the patients.
“ One of the most desperate attempts at murder the criminal annals of Arapahoe county record was made yesterday morning in the family of James T. Potter, an old citizen of Denver, residing at No. 865 Lawrence street, by means of arsenical poisoning. Th.e facts in the case betray a most *570 deplorable condition of affairs, and indicate, if their establishment can be judiciously reached, the presence of a dangerous member of the community, whose apprehension and confinement should be at once directed by the authorities. At an early hour on Monday morning, the would-be victim of crime with his family — consisting of a wife and children, a married daughter with her children, and servant girl— breakfasted, after which Mr. Potter, who is in the employ of the Denver and South Park road, proceeded to his business. Nothing occurred to disturbed the harmony of the household until about 9 o’clock. About that time Dollie Wilson, employed in the family, complained of feeling unwell, and, at the suggestion of Mrs. Potter, abandoned her household duties and retired. Nothing of any serious character was apprehended, and it was thought her illness would be succeeded by convalescence. Half an hour later one of the children of the family was sent to Miss Wilson’s room to ascertain her condition, and if there was anything she required. [Jpon opening the door of her apartment the youthful messenger was startled at the spectacle which greeted her gaze. The occupant was discovered prone upon the bed, her eyes gazing into vacancy, her form transfixed, great drops of perspiration exuding from her brow, and the unfortunate woman apparently in the final pangs of dissolution. The alarm was at once given, and such remedies administered as the limited resources of the house in that behalf afforded. While means for her revival were being employed, Mrs. Bradford, a daughter of Mr. Potter, on a visit to her parents, was seized with pains in the back, followed bjr profuse vomiting and other symptoms of poison, and was compelled to retire to her room, when-she became so violently ill that for the time being her life was despaired of. Soon after, her two children were similarly afflicted, and while they were being cared for by Mrs. Potter, that lady, with her four children, were compelled to yield and take to their beds. In the meantime Mr. Potter had departed the city for Dome Rock, a station on the Denver and South Park road, on official *571 business. He reached his destination almost at the hour his family'- was attacked, and while employed in the pursuit of the object of his mission was suddenly attacked with pains of the most violent character, investing his entire system, accompanied by vomiting and the attendant indication of poison. With the greatest effort he was able to reach the shelter of a tree, and his symptoms increasing in violence, he determined to gain the station and proceed home before he was incapacitated from travel. In this he was successful. He made out to reach the cars, which he boarded and came to Denver, arriving in the city late in the afternoon. En route hither his pains continued, but with the aid of friends he was supported until his destination was reached, when he was driven to his home and found his family as above described, every room in his house being allotted to the occupation of an invalid, none of whom had thus far received medical attendance. Upon his arrival, Mrs. Potter, by a wonderful exercise of will, arose from her bed of sickness and ministered to his necessities. Late in the day neighbors, who had been attracted by the strange occurrences of the day, called to ascertain the cause, and, learning the condition of affairs, improvised means at once for their comfort and recovery. Mr. Hurd, a son-in-law of the afflicted family, came soon after, and, uniting his exertions with those of others, soon had the invalids in a condition of comparative quiet, though the symptoms manifested still continued and refused to yield to such medicaments as had been administered. At one o’clock yesterday morning Dr. McBeth, the family physician, reached the afflicted family, and, after a careful diagnosis, decided the entire household were suffering from the effects of arsenical poison. Pie began a treatment at once to counteract its effect, and was greeted with but limited results at first, but assisted by those who had been summoned in view of the entire absence of nurses, he persevered, and by daylight had so far succeeded in his objects that the patients, with the exception of Miss Wilson, were pronounced in a fair way of recovery.
*572 “ The cause of this mysterious attempt at the murder of a prominent and influential family, as stated, was arsenic, and an investigation of the means by which it could have been introduced into the household was begun. The house is supplied with water by the Holly system, and on examination of the hydrant, disclosed the presence of what remained of a coating of white powder, lining the escape pipe for several inches from its mouth. Last evening a reporter of the Republican called at the residence of the family and witnessed a most pitiful spectacle. Mr. Potter was found in bed, still suffering great pains, but hopeful that he would survive the attack. Mrs. Bradford, though up and about, was moaning with pain and apparently enduring great suffering. Her children, with those of Mrs. Potter’s household, were entirely convalescent, while Miss Wilson was still confined to her bed with chances of recovery probable, rather than certain. Taken all in all, the situation, while more encouraging than could have been expected, was the reverse of cheerful, (meaning that an attempt had been made to commit the crime of murder upon the family of J. T. Potter by poison.)
“ In search of the author of this deplorable state of affairs, the reporter had his attention directed to a woman residing in the neighborhood, who is known under the historic pseudonym of ‘ Lucretia Borgia ’ (meaning this plaintiff), though more familiar to her neighbors and officers of the law as Liza Miner (meaning Eliza J. Miner, plaintiff in this action). She,(meaning this plaintiff) is said to have attempted her own life on one or more occasions, failing in which she (meaning this plaintiff) has supplied the craving for death, by scattering what is supposed to have been poison about the neighborhood, to the death of dogs, chickens and household pets. The Borgia of the fourteenth century is represented as having been beautiful as the phantom of a dream — tall and commanding, with a form of matchless symmetry. The modern Borgia (meaning this plaintiff) is diametrically the reverse in nearly every instance. With regard to the alleged type of that character suspicioned in this case (meaning this *573 plaintiff), the reporter is unable to define her excellencies or deficiencies, for last night she (meaning this plaintiff) was invisible. The neighbors speak of her (meaning this plaintiff) as one who has been guilty of eccentricities that can be accounted for on no other hypothesis than insanity. A Mrs. Stearns insists that she (meaning this plaintiff) poisoned her cow in the spring of 1881, and that upon repeated occasions she has witnessed her (meaning this plaintiff) scattering substance on potato parings, vegetables, etc., which, upon examination, she found to be ground glass. On yesterday morning Mrs. Stearns found a couple of ham bones tied in a paper, upon which had been sprinkled a white powder, with the nature of which she was ignorant. A prominent citizen residing in the neighborhood mentioned a circumstance which came under his observation several years ago. Capt. Henderson and ladjq employed in Snj'der & Strong’s book store, rented rooms of the Miner woman (meaning this plaintiff), who warned them to vacate, and they refusing, she (meaning this plaintiff) prepared a composition of brimstone, etc., which she (meaning this plaintiff) fired in the hall while Mrs. Henderson was asleep. The latter ivas awake duiing the smudging of the combustibles, and narrowly escaped with her life. The woman (meaning this plaintiff) subsequently stated to Mrs. Nichols, residing in the vicinity, that it was her intention to obtain possession of the rooms, even if she (meaning this plaintiff) was obliged to do-so at the sacrifice of life.
“It may be anything or nothing, her (meaning this plaintiff’s) alleged complicity, but the one thing certain about it all is that Mr. Potter’s family have been poisoned (meaning that the plaintiff herein poisoned the Potter family, and attempted to commit the crime of murder), and it seems to be the duty of the officers to seek out and punish the guilty party or parties (meaning that the plaintiff herein had attempted to commit the crime of murder by poisoning- the family of J. T. Potter, and should be punished according to the statute of the state of Colorado).”
The objections to the complaint, urged bj' defendant’s coun *574 sel, are, first, that the article complained of nowhere charges the plaintiff with the commission of any crime or offense, but is a statement merely of rumors existing in the neighborhood; and, second, that the innuendo with which the complaint concludes assumes that the publication charges the plaintiff with the violation of a statute, when there was no statute of this state defining the act mentioned in the innuendo as a crime or offense; that to charge one with an attempt to do an act is not actionable unless special damage be alleged; and that the plaintiff is bound by the innuendo.
The office of an innuendo in pleading is to explain the defendant’s meaning in the language employed, and also to show how it relates to the plaintiff, when that is not clear on its face. It is not permitted to put upon the words a construction which they will not bear, or alter or enlarge their sense. It is only where the words are not prima facie libelous that an innuendo is necessary; so that where the meaning of the language is plain, and bears its own interpretation upon its face, no innuendo is required. Where the meaning is not thus apparent, and an explanation is necessary, the innuendo is used to express the plaintiff’s construction of the words; but 'it cannot enlarge or vary their sense, and is of no avail unless the words to which it is applied have a violent presumption of the innuendo. Castleman v. Hobbs, Cro. Eliz. 428. But in such case the plaintiff must abide by the interpretation he has given; he cannot abandon it and adopt another.
Where, however, the obvious import of the words themselves is libelous, and no construction is needed, then the innuendo, if there be one, is superfluous; and no matter how much violence it may do to the language it purports to construe, it may be rejected as surplusage. The complaint is good without it. Carter v. Andrews, 33 Mass. 1; Kraus v. Sentinel Co., 60 Wis. 425; Bain v. Myrick, 88 Ind. 137.
If the result of an examination of the article complained of is that it is actionable upon its face, then the innuendo becomes immaterial, and a decision of any question raised upon it will be unnecessary.
*575 A libelous publication is one which charges or imputes to any person that which renders him liable to punishment; or, which is calculated to make him the subject of hatred, odium, contempt or ridicule. Republican Pub. Co. v. Mosman, 15 Colo. 399; White v. Nichols, 3 How. U. S. 266; Hillhouse v. Dunning, 6 Conn. 407; Colby v. Reynolds, 6 Vt. 489; Dexter v. Spear, 4 Mason, 115: 1 Hilliard on Torts, ch. VII, § 13.
Testing the publication in question by this definition, we have no hesitation in pronouncing it libelous on its face. It announces in startling headlines the commission of a fiendish act — an attempt at murder, by the poisoning of the family of James T. Potter. It px-oceeds to give the details of.the atrocity, alleges a search for the author, and directs public attention to the plaintiff in such manner as would naturally cause suspicion to rest upon her as the would-be murderess. There is xxo direct chai'ge, but there is insinuation, which may be equally injurious. A suspicion, instilled into the minds of the public, that the diabolical attempt at murder, which is desci'ibed, was made by the plaintiff, might be as operative in overwhelming her with odium and contempt as a positive charge to the same effect. The obvious tendency of the publication, taken as a whole, is to fasten suspicion upon the plaintiff, and it is therefore actionable. Starkie on Slander and Libel, 12, 92; Drummond v. Leslie, 5 Blackf. 453; Bain v. Myrick, supra.
But the published article is libelous in other respects. It describes the plaintiff as having such a mania for desti'uetion that-she wpeaked her vengeance on dogs, chickens and household pets, by scattering poison about the neighboi’hood ; that she poisoned a cow; tiled to take her own life ; and attempted the destruction of a family, against whom she had some kind of a grudge, by a composition of brimstone, etc. W an ton and malicious acts like these would necessarily excite fear and abhorrence among her neighbors; and, as the complaint avers the chai'ge that she committed them to be false, and the motion in arrest admits the truth of the complaint, the libelous character of the statement is unquestionable.
*576 It is true that the writer does not make the various charges as o£ his own knowledge. He claims to derive his information from outside sources, sometimes giving his authority, and sometimes not: but it is plainly not mere rumors which he has repeated, as counsel urges; his language is too explicit for that; but even if it were, giving counsel the benefit of all he claims in this particular, still that would not vitiate the complaint, or be a bar to the action. This is not slander, it is libel; and the power of the press to make and unmake reputations is so great, that words, which would not be the subject of a suit, if spoken merely, are actionable when printed and published in a newspaper.
In Skinner v. Powers, 1 Wend. 451, the court say: “It cannot surely be necessary to go into an examination of authorities to show, that the publication in a newspaper of rumors is not justified by the fact that such rumors existed.” See also, Starkie on Slander and Libel, 278, 279.
The court did not err in denying defendant’s motion, and the judgment will be affirmed.

Affirmed.